# IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>　　　　Plaintiff,　　　　　) <br>　　　　　　　　　　　　　　)<br>　　v.　　　　　　　　　　　)<br>　　　　　　　　　　　　　　)　CRIMINAL NO. 1:24-0020-WAL-EAH<br>ROSNIEL DIAZ-BAUTISTA,　　　)<br>　　　　Defendant.　　　　　)<br>　　　　　　　　　　　　　　) | |

## MOTION TO COMPEL DISCLOSURE OF MATERIALS RELATED TO THE DELIBERATIVE PROCESS RESULTING IN THE ATTORNEY GENERAL'S DECISION TO OVERRULE THE UNITED STATES ATTORNEY'S OFFICE AND CAPITAL REVIEW COMMITTEE AND SEEK THE DEATH PENALTY

Defendant Rosniel Diaz-Bautista respectfully moves for an Order compelling the Government to disclose all materials requested in the discovery demand dated September 30, 2025 (attached hereto as Exhibit A). Each of these items are relevant and essential to the "deliberative process" by which the Attorney General decided—**despite the expedited no-seek recommendation from both the United States Attorney's Office and the DOJ Capital Review Committee**—to seek Mr. Diaz-Bautista's execution.

In a move wholly unprecedented in the thirty-plus year history of the modern federal death penalty, the Government has filed a Notice of Intent to Seek the Death Penalty without granting the defense any opportunity to submit mitigating evidence, make a mitigation presentation, or otherwise participate in the capital-authorization process required by every version of the DOJ's Death Penalty Protocol since its inception in 1995. Because adherence to the Protocol is essential to ensuring the non-arbitrary, constitutionally-sound exercise of prosecutorial discretion to decide whether to seek the ultimate sanction of the death penalty, disclosure is necessary to evaluate, further investigate, and litigate whether the Government's conduct in this case complied with

1

Constitutional and other protections. The requested materials are essential to the Court's ability to determine whether seeking the death penalty meets constitutional and statutory requirements.

The Supreme Court has repeatedly emphasized the "heightened reliability" required when the death penalty is at issue. A capital decision reached without the safeguards DOJ deems essential necessarily raises questions of arbitrariness, selective enforcement, the improper influence of political and other considerations, and the distinct possibility of inaccurate or incomplete information (*i.e.*, the opposite of "heightened reliability"). Only full disclosure will permit the defense to effectively and meaningfully litigate whether the Death Notice rests on lawful grounds.

**Statement of Facts and Procedural history**

On December 17, 2024, the Government filed a three-count indictment charging Rosniel Diaz-Bautista with using a firearm during a crime of violence resulting in death in violation of 18 U.S.C. § 924(j)(1) (Count One); discharging a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and committing first degree murder in violation of Title 14, Virgin Islands Code, Sections 921, 922(a)(1), and 923 (Count Three). ECF Doc. No. 24. Because Count One carries the potential penalty of death, the DOJ's Death Penalty Protocol was immediately triggered. That Protocol establishes a purportedly structured, "multi-tier"[1] review process intended to ensure consistent, fair, and individualized capital charging decisions. *See* 18 U.S.C. § 924(j)(1); Justice Manual § 9-10.010.

The Court established a deadline for the government's decision whether to seek the death penalty. The defense, in good faith, agreed to four separate extensions of the authorization deadline set by the Court. ECF Doc. Nos. 36, 43, 46, 47, and 50. Because the Government never requested mitigation materials, it was apparent that the U.S. Attorney's Office recommended an expedited

---

[1] See also, JM § 9-10.140 (discussing "the multi-tier process used to make determinations in this Chapter…").

2

no-seek recommendation. The Government reaffirmed this posture as late as June 9, 2025, when it notified the parties and the Court that the case had been transmitted to the Attorney General's Capital Case Review Committee (CCRC) for further consideration without requesting mitigation. ECF. Doc. No. 50. See generally, Justice Manual, § 9-10.070 ("Expedited Submission Decisions" include any case "where the United States Attorney … is able to recommend the death penalty not be sought without first receiving input from defense counsel.")

Inexplicably, on the date of the fifth authorization deadline, July 31, 2025, the Government arbitrarily filed a Notice of Intent to Seek the Death Penalty. ECF Doc. No. 54. At no point before that filing did the United States ask for, accept, or invite the submission of mitigation evidence, argument, or background materials relating to Mr. Diaz-Bautista's history, mental health, social background, or any other relevant factors. The government arbitrarily failed to provide "an opportunity to present evidence and argument in mitigation", as required by the Protocol and provided in every other case where a decision was later made to seek the death penalty. *See*, *e.g.*, JM § 9-10.130 ("No final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation.")

On September 30, 2025, counsel requested information concerning the authorization process; specifically including but not limited to materials indicating what recommendations had been made, whether the case had been handled under expedited procedures, and the basis for the reversal of the United States Attorney's no-seek request. *See* Exhibit ("Exh. A"). This discovery request was discussed at the October 15th Calendar Call. Thereafter, the parties met and conferred pursuant to Local.R.Crim.P. 16.1 on November 20-21, 2025. The Government refused to provide any of the materials sought via Exhibit A, alleging that the materials were "privileged", and that the Defendant had no right(s) to challenge the authorization decision.

3

**I. The Death Penalty Protocol and Its Requirements**

Section 9-10.000, *et. seq*. of the DOJ Justice Manual, hereinafter the "Death Penalty Protocol" or "Protocol," "sets forth the policies and procedures for all Federal cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty." Justice Manual § 9-10.000, *et seq*. The Protocol includes a review process with "[t]he overriding goal" of ensuring "proper individualized consideration of the appropriate factors relevant to each case." Justice Manual § 9-10.030. Further, the Protocol is designed to prevent "[a]rbitrary or impermissible factors—such as a defendant's race, ethnicity, or religion" from infecting the determination process. *See also Furman v. Georgia*, 408 U.S. 238, 239-40 (1972) (per curiam) (holding "the imposition and carrying out of the death penalty" in cases where the death penalty is imposed in an arbitrary and discriminatory manner "constitute[s] cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments."); *Banks v. Horn*, 316 F.3d 228, 249 (3d Cir. 2003) (Sloviter, J., concurring) (citing *Furman* for proposition that trial procedures invalid if they "created a substantial risk that death penalty would be imposed in an arbitrary and capricious manner"), *rev'd on other grounds and remanded sub nom. Beard v. Banks*, 542 U.S. 406 (2004).[2]

Expedited review of the decision whether to seek the death penalty occurs in cases where "the United States Attorney or Assistant Attorney General is able to recommend the death penalty not be sought without first receiving input from defense counsel." Justice Manual § 9-

---

[2] *Cf. Gov't of Virgin Islands v. Gereau*, 592 F.2d 192, 194 (3d Cir. 1979) (quoting Douglas, J., concurrence in *Furman*, "discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments"); *Furman*, 408 U.S. at 275-77 (Douglas, J., concurring) ("'Cruel and unusual punishments are forbidden by the Constitution.'… This principle is especially important today. There is scant danger, given the political process 'in an enlightened democracy such as ours,' that extremely severe punishments will be widely applied. The more significant function of the [Eighth Amendment], therefore, is to protect against the danger of their *arbitrary* infliction.") (emphasis added), *quoting*, *Wilkerson v. Utah*, 99 U.S. 130, 134 (1879), *and Trop v. Dulles*, 356 U.S. 86, 100 (1958).

4

10.070(A)(5). The Protocol directs that submissions for such decisions be made via prosecution memorandum submitted to the Capital Review Committee. Justice Manual § 9-10.070(C).

From the date of Mr. Diaz-Bautista's arrest, until February 2025, the version of the Protocol in effect was January 2023. *See* Exhibit B – 2023 Protocols. Executive Order 14164 (January 20, 2025) demanded that "[t]he Attorney General shall take all appropriate action to modify the Justice Manual based on the policy and purpose set forth in this Executive Order," and Attorney General Bondi then issued a Memorandum advising–among other things–that "all previous Department policies relating to the death penalty that are inconsistent with the Executive Order and the policies set forth herein … **are rescinded effective immediately**." *See* Exhibit C - AG Memo in discovery letter. The DOJ updated the Protocol on its website to revert to the pre-2021 version.

Every version of the Protocol, including the present version, contains the same rule: *no final decision to seek the death penalty may be made unless defense counsel has first been afforded an opportunity to present evidence and argument in mitigation to the decision-makers*. This rule reflects the DOJ's longstanding position, articulated repeatedly in federal courts and Congressional testimony (see, *infra*), that procedural consistency and robust mitigation review are essential to preventing arbitrary and/or discriminatory capital charging.

Under Justice Manual § 9-10.130, if any member of the CCRC believes a seek recommendation is warranted, the case must proceed through the standard review process, which requires notifying defense counsel and giving them a meaningful opportunity to submit mitigation materials in writing or orally. When the United States Attorney or Assistant Attorney General seeks an expedited decision without defense counsel input, they are necessarily making a no-seek recommendation. The CCRC either agrees, thus staying on the expedited track without meeting with counsel, or disagrees, in which case the matter is removed from expedited review and the

5

Committee considers all submissions from both the prosecution and defense. Justice Manual § 9.10-130. All memoranda are then provided to the Deputy Attorney General who makes a recommendation to the Attorney General, the final decision maker. *See* Justice Manual § 9.10-130

Because defense counsel here were never afforded any opportunity to make such a submission or presentation in this case, the only conclusions possible are that either (1) the U.S. Attorney and the CCRC submitted a "no-seek" memorandum but some later decision-maker reversed course without complying with the mandatory mitigation requirement, or (2) the U.S. Attorney and/or CCRC made a "seek" recommendation without adhering to the well-established procedural protections. Either scenario represents a significant deviation from federal charging law and practice. Upon well-founded information and belief, the **former** scenario is an accurate portrayal of the instant events. If we are mistaken, all the government has to do is say so.

### II. Arbitrariness - The Government has Repeatedly Relied on the Protocol as a Guarantee Against Arbitrary Death Authorizations

The Government has consistently argued in federal courts that DOJ's Protocol safeguards against arbitrary death-penalty decisions. DOJ has maintained that the Protocol was designed and implemented "to promote consistency and fairness"[3] (among the very bedrock principles of death penalty jurisprudence), and as several courts have recognized, the government's purported compliance with the Protocol has been a significant factor in reducing arbitrariness in authorization decisions.[4] Courts have accepted and relied upon these arguments when rejecting constitutional

---

[3]     *See* 1997 Protocol, at § 9-10.080 ("The authorization process is designed to promote consistency and fairness.")

[4]     *See*, *e.g.*, *U.S. v. Booth*, No. 2:08-cr-00283-RCJ-RJJ, 2010 U.S. Dist. LEXIS 83022, at *2-3 (D. Nev. July 8, 2010) ("In order to aid in the even-handed and non-arbitrary application of Federal capital sentencing laws, the Department of Justice has issued what is commonly referred to as the 'death penalty protocol.'"); *U.S. v. Aquart*, No. 3:06cr160 (JBA), 2010 U.S. Dist. LEXIS 113514, at *10 (D. Conn. Oct. 26, 2010)(rejecting arbitrariness challenge in part because "the decision to seek the death penalty … is centralized in the hands of the Attorney General in coordination with the Department of Justice Capital Review Committee, **and they follow delineated procedures [under the Justice Manual]**.") (emphasis added); *U.S. v. Saipov*, No. 17-CR-722 (VSB), 2019 U.S. Dist. LEXIS 24318, at *7 n.8 (S.D.N.Y. Feb. 14, 2019) ("… the fact that the Government appears to have fully complied with the

challenges, emphasizing that the multi-layered review and mitigation process create "objective assurances" that the death penalty is not sought arbitrarily, nor based on impermissible factors such as race, ethnicity, geography, or personal bias.

Recently, the government expressly relied upon the proposition that "[t]he procedures set forth in the Protocol … buttress the conclusion that decisions to seek the federal death penalty are not arbitrarily made." *U.S. v. Gendron*, No. 22-cr-109-V, DE 191 at 14 n.7 (W.D.N.Y. July 19, 2024). The government further argued that the Protocol's safeguards "guided and bounded"[5] prosecutorial discretion and expressly rejected the propriety of "strip[ping] decisionmakers of their ability to exercise the very discretion that benefits individual defendants." *Id.*, at 16. In *U.S. v. Spurlock,* 23-cr-00022, Doc. 405 (D.Nev. April 25, 2025), the Government similarly contended that "the Capital Case Protocol further ensures proper individualized consideration of the appropriate factors relevant to a case." Contrast *U.S. v. James,* No. 8:18CR333, 2019 U.S. Dist. LEXIS 57942, at *7 (D. Neb. Apr. 4, 2019) ("If the Review Committee does not have a defendant's mitigation evidence, then it cannot consider all of the appropriate factors relevant to each case."). *See also U.S. v. Madison*, 6:17-cr-00015-RBD-KRS, Doc. 324, (M.D.FL July 2, 2018).[6]

---

Protocol constitutes evidence that the Attorney General's death penalty decision was not arbitrary or infected by improper influence."); *U.S. v. Lujan*, No. CR 05-924 RB, 2008 U.S. Dist. LEXIS 145265, at *6-8 (D.N.M. Oct. 23, 2008) (relying on the Death Penalty Protocol in finding that "[t]he process by which the Government decided whether to seek the death penalty contains multiple safeguards to prevent arbitrariness in its selection decision. … **The decision is not that of one person, but of several**.") (all emphasis added); *U.S. v. Sampson*, 486 F.3d 13, 24 (1st Cir. 2007) (noting, upon the record then before it, that "the process contains numerous safeguards built into an articulated death penalty protocol ... [and therefore] is not arbitrary."); *U.S. v. Bowers*, No. 18-292, 2020 U.S. Dist. LEXIS 59764, at *8-9 (W.D. Pa. Apr. 6, 2020) (" … contrary to the Defendant's arguments, prosecutorial discretion is … guided by safeguards set forth in a formal Protocol in selecting cases for capital prosecution ...").

5      *Gendron*, *supra*, at 14 ("[t]he prosecution's discretion to seek the death penalty … is guided and bounded by the FDPA … **as well as the safeguards included in the Justice Manual's Death Penalty Protocol**.") (emphasis added).

6      *See also*, *e.g.*, *U.S. v. Baquedano*, 10 CR 20338 (E.D.Mich. 2011) Doc. 124 (government arguing that a "miscarriage of justice" would result if defendants did not receive "a chance to submit mitigation materials to the United States Attorney's Office …"); *U.S. v. Ball,* 05-cr-00100-PLF (Doc. 453)(Filed 9/25/06) (D DC) (government conceding its "obligation to make sure that the Attorney General and his staff were advised of all the relevant facts and policy considerations in order to assure that the grave and serious decision to pursue capital punishment was given the full and careful deliberative process it deserves" and that "it would have been improper to rush such an important decision."); *U.S. v. Bush,* 18-cr-00188-CHB-RSE (Doc. 9)(11/19/18) (WD KY) (government conceding

7

When Congress has exercised its oversight authority regarding the fairness and constitutionality of the federal death penalty, DOJ has relied extensively on its compliance with the Protocol, with testimony describing an authorization process involving: "nothing less than … full and careful review,"[7] with "multiple opportunities for defense counsel to provide information favorable to their client and argue against the Government seeking the death penalty,"[8] wherein "individual characteristics are highlighted,"[9] including "relevant … mitigating circumstances."[10]

Margaret Griffey, then-Chief of the DOJ's Capital Case Unit and longstanding member of the Capital Case Review Committee, testified before Congress in 2006 that "[t]here are few greater responsibilities of … the Department of Justice than ensuring that there is a federal death penalty procedure in place that comports with all constitutional requirements."[11]  In her view, "… a grand jury's determination [of] probable cause … that the defendant committed the charged offense [is] hardly an adequate basis upon which to decide whether to seek the death penalty," and therefore, "nothing less than … full and careful review should precede [such a] decision."[12]

Similarly, DOJ Capital Case Unit Chief Barry Sabin testified in 2008 before Congress that the Protocol was effective because it provided **"multiple opportunities for defense counsel to**

---

that adequate time to comply with the Protocol is necessary because "[t]he ends of justice require that prosecutors make wise and well-informed decisions on whether to seek the death penalty to guarantee that this ultimate punishment is used only when most appropriate ... [and] the gravity of this decision cautions against a process built for speed rather than for justice."), *citing*, *U.S. v. Dominguez-Maqueda*, No. CR 06-86 JB, 2006 WL 1308266, at *5 (D.N.M. 2006); *U.S. v. Purinton*, 2:17-cr-20028-CM-JPO (D KS)(Doc. 20)(7/18/17) (same) (and government further urging that "[a] stay of these proceedings … during the pendency of the Capital Case Review Process, which the United States anticipates will last up to six months, would serve the interest of justice in several different ways. A stay would give the parties appropriate time to investigate and to present aggravating and mitigating factors bearing upon the death penalty decision [and] would give the Attorney General and his advisors appropriate time to weigh those factors and make a decision…")

[7]     *See* Testimony of Margaret P. Griffey, hearing before the Congressional Sub-Committee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, March 30, 2006.
[8]     *See* Testimony of Barry Sabin, *Oversight of the Federal Death Penalty*, Hearing Before the Subcommittee on the Constitution of the Committee on the Judiciary, United States Senate, June 27, 2007.
[9]     *Id*.
[10]    *Id*.
[11]    Testimony of Margaret P. Griffey, *supra*.
[12]    *Id*.

8

**provide information favorable to their client and argue against the Government seeking the death penalty"** and "[t]he review also ensures that **individual characteristics are highlighted** …" In Mr. Sabin's words, "[t]he Justice Department's decision turns on what the defendant has done and the relevant aggravating **and mitigating circumstances**."[13] (emphasis added).

    Those "multiple opportunities" continue to be reflected in the Protocol's discussion of "the multi-tier process used to make determinations" whether to seek the death penalty. Justice Manual § 9-10.140; *see also U.S. v. Vasquez*, *et. al.*, CR-24-00226-BLF (ND CA), Transcript of Proceedings, July 15, 2025 (prosecution conceding that "the government independently has a duty to consider mitigation when it is making this death penalty determination"); *Gendron*, *supra*, Doc, 191, at 17 (prosecution conceding its "duty to consider the individual circumstances of each case in determining whether to seek the death penalty," as well as "the mandated individualized consideration that informs every decision to seek the death penalty.").

    Federal prosecutors have repeatedly assured courts that the Protocol ensures individualized consideration as a means to preclude arbitrary outcomes. Congressional testimony has described the Protocol as the backbone of the fundamental fairness required in federal capital charging. If the Government failed to follow these protections here, the very foundation upon which courts have historically trusted federal capital practices is called into question. The government cannot rely upon the Protocol when strategically advantageous, while minimizing it whenever it is not.

    The requested materials are essential to our ability to fully establish that the authorization process here lacked any semblance of "full and careful review" and/or "multiple opportunities for defense counsel to provide information favorable to their client and argue against the Government seeking the death penalty". Nor were "individual characteristics …highlighted", including

---

[13]    Testimony of Barry Sabin, *ante*.

"relevant … mitigating circumstances." *See*, *e.g.*, *U.S. v. James*, *supra* ("If the Review Committee does not have a defendant's mitigation evidence, then it cannot consider all of the appropriate factors relevant to each case."). *See also U.S. v. Saipov*, No. 17-CR-722 (VSB), 2019 U.S. Dist. LEXIS 24318, at *7-8 (S.D.N.Y. Feb. 14, 2019) Here that assertion is an undisputed fact.

### III. The Government's Failure to Follow the Protocol Necessitates Disclosure Because the Decision-Making Process Occurred Without Required Defense Input.

A capital defendant must be provided a fair, non-arbitrary, and informed charging process. *See, e.g.*, *Lewis v. Jeffers*, 497 U.S. 764, 782 (1990) (noting "the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty."); JM § 9-10.030 ("Arbitrary or impermissible factors … will not inform any stage of the decision-making process."); *Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016) ("… there can be no doubt that the decision to pursue the death penalty is a critical choice in the adversary process. Indeed, … whether to ask a jury to end the defendant's life is one of the most serious discretionary decisions a prosecutor can be called upon to make."); *Reviving the Federal Death Penalty*, Attorney General Memo, February 5, 2025 (AG Bondi conceding that "… whether to seek death is among the Department's most serious and solemn responsibilities."). *See also* 18 U.S.C. § 3595 (providing for remand or "imposition of a sentence other than death" "[w]henever the court of appeals finds that … the sentence of death was imposed under the influence of passion, prejudice, **or any other arbitrary factor** …") (emphasis added); *Banks v. Horn*, *supra*, 316 F.3d at 249.

When the Government fails to follow the procedures designed to ensure fairness, the risk of arbitrariness becomes intolerably high. The Protocol is intended to prevent such arbitrariness. Disclosure is the only mechanism by which defense counsel and the Court can effectively evaluate whether the authorization was made based on complete, accurate, and fair information, or, alternatively, unconstitutionally arbitrary factors or circumstances. *Gardner v. Florida, 430* U.S.

10

349, 361 (1977)(Constitutional error "when [a] death sentence was imposed, at least in part, on the basis of information which [Defendant] had no opportunity to deny or explain.")

The Government denial of any opportunity to submit mitigation evidence at any stage of the authorization process is far more than a minor technical deviation. Mitigation review is the core procedural step in the Protocol. Mitigation is the principal safeguard necessary to prevent arbitrary charging decisions, to ensure individualized consideration, and to avoid decisions grounded in impermissible considerations such as ethnicity, race, geography, or prosecutorial preference or political factors. The Government's failure dictates that the Attorney General's "seek" decision was made in a vacuum, uninformed by the most basic facts about Mr. Diaz-Bautista's background, mental health history, trauma, family circumstances, or other mitigating considerations courts have repeatedly recognized as essential in capital cases. This violates fundamental due process and the Eighth Amendment's requirement that capital decisions reflect a careful, reliable assessment of the defendant's culpability.

For months, it was clear that the U.S. Attorney's Office was pursuing an expedited decision. The Government sought extensions based on this understanding without ever seeking a defense submission—thereby confirming to counsel that this case was proceeding in a no-seek posture. No new evidence or changed circumstances arose between those representations and the filing of the Death Notice. The sudden reversal in posture resulted from either a breakdown in required procedures or a failure to follow DOJ policy at the review stage. In either scenario, the requested discovery is essential to a meaningful overview and understanding of the relevant issues. This is not a situation where mitigation was offered but declined, delayed, or procedurally complicated. **No opportunity was provided at all.** The resulting authorization was made without the

adversarial balance that the Protocol demands. Documents reflecting how this departure occurred are therefore central to future litigation.

The Government's November 20, 2025 discovery response confirms that it refuses to produce any materials related to the DOJ's internal capital decision-making process. The Government asserts that the defense's September 30 request "is not relevant," falls "outside the scope of Rule 16, the Jencks Act, and *Giglio*," and that the materials sought are "privileged and shielded from disclosure." The Government further states that the Justice Manual does not create enforceable rights and, for that reason, it will not "admit to or stipulate to any of the requested items." *See* Exhibit D – Government Letter in Response to Defense Discovery Requests; see *also* Exhibit A. The Government asserts two flawed premises: first, that the internal capital-charging process is irrelevant to any litigation in this case; and second, that any materials relating to that process are privileged and categorically insulated from disclosure. Both positions conflict with controlling constitutional principles, established federal case law, and the fundamental reliability requirements governing capital charging.

The materials are not sought to enforce the Justice Manual as a source of substantive rights. Rather, they are sought because the Government's compliance with the Manual, and specifically its compliance with the obligations embedded within the federal Death Penalty Protocol, is directly relevant to a central issue before the Court: whether the Attorney General's decision to seek the death penalty in this case was made in a manner consistent with the Eighth Amendment's heightened reliability and non-arbitrariness requirements and the Fifth Amendment's Due Process Clause. The Manual is relevant not because it creates independently enforceable rights, but because it contains the procedures the federal government has long represented as essential to ensuring that capital charging decisions are not arbitrary, biased, or otherwise constitutionally infirm. With past

as prologue, the Manual is relevant because DOJ has routinely defended against Due Process, Equal Protection and Eighth Amendment challenges by asserting that compliance with the Protocol ensured that no violations of those constitutional guarantees occurred.[14]

The Government seeks to avoid any scrutiny of whether those procedures were followed. The Government asserts that the request for capital-authorization materials is "not relevant," despite its arbitrary filing of a Notice of Intent without providing any opportunity for the defendant to participate in the very process designed to ensure individualized, fair, and non-arbitrary consideration of whether death is legally appropriate—an unprecedented action by DOJ since the inception of the Protocols in 1995. The Government's assertion that these circumstances bear "no relevance" is incompatible with controlling Eighth Amendment jurisprudence and the clear weight of authority holding that compliance with capital-charging procedures is a legitimate and necessary area of judicial inquiry. *Furman v. Georgia*, 408 U.S. 238 (1972).

### IV. The Deliberative Process Privilege Does Not Bar Disclosure: the Decision-Making Process is at Issue and the Government's Conduct Must be Subject to Review

The Government invoked the deliberative process privilege on October 15, 2025, and again in its November 20, 2025, reply to Defendant's discovery requests, to attempt to shield from disclosure the memoranda, recommendations, and communications underlying its decision to file a Notice of Intent to Seek the Death Penalty against Mr. Diaz-Bautista. (*See* Exhibit D at 2). That privilege is qualified and narrowly construed, and–as the Court preliminarily recognized at the Status Conference—simply does not apply when, as here, the Government's decision-making process **is itself** the subject of the litigation. The question before the Court is whether the

---

[14] The requested discovery regarding noncompliance with the Protocol is particularly important because precedent addressing Due Process, Equal Protection and Eighth Amendment challenges have generally presupposed compliance with the Protocol. The manner of noncompliance with said Protocol could well invalidate the application of otherwise-applicable precedent to such potential challenges raised in this case.

13

"deliberative process" in this case was infected by arbitrary factors, including but not limited to whether federal prosecutors complied with the DOJ's Death Penalty Protocol before authorizing a capital prosecution, and whether that process was bypassed, distorted, subject to impermissible bias and/or political motivations, or conducted on an incomplete record.

The deliberative process privilege cannot be used to shield information when the very purpose of the litigation is to examine how the government reached the decision at issue. The "deliberative process" privilege disappears when the Government's internal reasoning or procedural compliance is the central issue. When the decision-making process itself is the subject of litigation, "it is inappropriate to allow the deliberative process privilege to preclude discovery of relevant information." *Williams v. City of Boston*, 213 F.R.D. 99, 102 (D. Mass. 2003). The privilege "cannot be a bar to discovery" when the litigation challenges the integrity of the government's decision-making. *Greater New York Taxi Association v. City of New York,* 2017 U.S. Dist. LEXIS 146655, at *29 (S.D.N.Y. Sep. 11, 2017).[15]

The record already demonstrates several significant irregularities. For months, it was apparent that the U.S. Attorney's Office sought an expedited no-seek decision. The Government never notified defense counsel of any change, never solicited mitigation, never conducted the mitigation meeting provided for in the Protocols, and never offered the defense the opportunity to have such meeting. Yet the Government arbitrarily filed a Death Notice anyway. These actions go to the core of whether the decision-making process was lawful.

---

[15] *See also, e.g., Appalachian Regional Healthcare, Inc. v. Coventry Health & Life Insurance Co.*, No. 5:12-00114-KKC, 2014 U.S. Dist. LEXIS 65503, at *8 (E.D. Ky. May 13, 2014) found that "[e]ven if the [requested items] were encompassed by the deliberative process privilege, that privilege may not be invoked where the decision making process is the subject of the litigation, as it is here." *In re Sealed Case*, 121 F.3d 729, 746, 326 U.S. App. D.C. 276 (D.C. Cir. 1997) held that the privilege "disappears altogether when there is any reason to believe government misconduct occurred." *See also U.S. v. Lake County Board of Commissioners*, 233 F.R.D. 523, 527 (N.D. Ind. 2005); *Tri-State Hospital Supply Corp. v. U.S.*, 226 F.R.D. 118, 135 (D.D.C. 2005).

14

The discovery sought is the only means to determine whether the Government followed its mandatory procedures or misrepresented its posture to the Court and defense. The Government cannot insulate a constitutional challenge simply by labeling these materials "privileged," especially where the Department has repeatedly described federal capital authorization as "one of its most serious and solemn responsibilities." *See* Bondi Memorandum, February 5, 2025, *supra*.

The suggestion that the defense may submit a post-authorization request to withdraw the Notice of Intent under Justice Manual § 9-10.160(B) does not cure the problem. (*See* Exhibit D at 2). That procedure is not a substitute for the pre-authorization mitigation process guaranteed by the Protocol, as the Protocol envisions the opportunity to make mitigation presentations both pre-authorization and post-authorization. Nor does the post-authorization withdrawal process provide a meaningful mechanism for determining whether the pre-authorization process was followed, whether the Attorney General relied on an incomplete record, or whether the authorization decision was reached in violation of constitutional requirements. The post-authorization petition procedure exists as an additional safeguard or check and balance to, not in place of, the Government's obligation to ensure that the initial authorization complies with governing law and the Department's own mandated safeguards. The Government cannot violate its own procedures, refuse to disclose whether those procedures were followed, and then insist that the defense seek discretionary reconsideration without access to the underlying record. Nor can the government defend against constitutional challenges with precedent presupposing that the Protocol was followed. *See also U.S. v. Pena-Gonzalez*, 62 F. Supp. 2d 358, 365 (D.P.R. 1999) (striking Notice of Intent because "effective assistance of counsel at [a] reconsideration hearing is an inadequate remedy because Defendant's likelihood of becoming decertified [is] poor at best.").

A request by a defendant to withdraw a notice of intent does not stand on an even playing field with a defendant's request that the case not be authorized at the initial stage at all. Unlike an initial request, for an authorization to be withdrawn, the defense submission must be based "on material changes in the facts and circumstances of the case from those that existed at the time of the initial determination." Justice Manual § 9-10.160(A); *see also* Justice Manual § 9-10.160(B). Additionally, if the U.S. Attorney or "fewer than two members of the Capital Review Committee" do not agree "with the defendant's request to withdraw the notice of intention to seek the death penalty," then the defendant's request *will not even be considered* by the Attorney General. Justice Manual § 9-10.160(B). Moreover, "[a]bsent extraordinary circumstances, the Department will not consider successive defense requests to withdraw the notice of intention to seek the death penalty." *Id.* Thus, by authorizing a death penalty prosecution against Mr. Diaz-Bautista without providing the defense with an opportunity to present mitigation before doing so, the Government has not merely taken away the defendant's initial opportunity to present mitigation on a clean slate but has effectively precluded the defense from making more than one argument against the authorization of a capital prosecution. The privilege does not apply when the purpose of discovery is to expose governmental malfeasance or procedural violations. The privilege cannot be asserted where the primary purpose for disclosure of materials is to expose "government malfeasance." *Fsi Green Park South Property, LLC v. City of Pelham*, No. 2:18-cv-1211-GMB, 2021 U.S. Dist. LEXIS 273687, at *8-9 (N.D. Ala. Oct. 1, 2021); *Montes v. Cicero Public School District 99,* No. 12 C 2892, 2014 U.S. Dist. LEXIS 207463, at *5 (N.D. Ill. May 2, 2014). The discovery requested here serves that exact purpose. Any failure to follow the Protocol constitutes the type of procedural violation that courts have held must be subject to scrutiny rather than concealed behind a privilege.

As a qualified privilege, the deliberate process privilege "can be overcome by a sufficient showing of need." *In re Sealed Case*, 121 F.3d 729, 737–38 (D.C. Cir. 1997). Courts "routinely" deny the privilege "[w]here there is reason to believe the documents sought may shed light on government misconduct . . . on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'" *In re Sealed Case*, 121 F.3d 729, 737–38 (D.C. Cir. 1997) (citing *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir.1995)).

Decisions such as *New York v. U.S. DOC*, No. 18-CV-2921 (JMF), 2018 U.S. Dist. LEXIS 172468, at *19 (S.D.N.Y. Oct. 5, 2018), *Shinnecock Indian Nation v. Kempthorne*, 652 F. Supp. 2d 345, 361 n.8 (E.D.N.Y. 2009) ("some courts have found the deliberative process privilege to be inapplicable in situations where the government's decision making process is the subject of the litigation, particularly where the cause of action is directed at the government's motivation or intent …") and *Jones v. Hernandez*, No. 16-CV-1986-W(WVG), 2017 U.S. Dist. LEXIS 110745, at *14 (S.D. Cal. July 14, 2017), recognize that the deliberative process privilege does not apply when litigation challenges whether the government acted with improper motives or ignored required procedures. Here, the Government's internal motives and procedural reasoning in bypassing the mitigation process are at the heart of the dispute, rendering the privilege inapplicable.

The Government's November 20 response strengthens the necessity of compelling disclosure. It confirms the Government intends to withhold all materials that would reveal whether the mandatory mitigation process was followed, whether the case was ever properly placed in expedited review, whether the Government knowingly withheld notice that the case had moved into "seek" consideration, whether the Government's motions for extensions of time to file a notice of intent to seek the death penalty were accurate and candid, whether the U.S. Attorney initially

17

recommended against death, whether the CCRC overrode that recommendation, and whether the Attorney General received an accurate and complete record, and properly and meaningfully considered the appropriate factors before electing to seek Mr. Diaz-Bautista's execution. The Government's categorical refusal, its mischaracterization of relevance, and its incorrect assertion of privilege all underscore that the Court's intervention is required to prevent the ultimate punishment from resting on a procedurally and constitutionally defective authorization process.

The authorization materials are central to determining whether the Death Notice was lawfully and constitutionally authorized. There are no alternative means for the defense to obtain this information. The issues at stake involve the most severe punishment permitted by federal law. The DOJ's decision-making process is not a collateral issue; it is the very subject of this litigation. The privilege does not apply where procedural propriety, governmental intent, or potential misconduct are at issue. The Government cannot rely on the deliberative process privilege to conceal whether it followed the very procedural safeguards that federal courts, prosecutors, and DOJ leadership have long represented as the cornerstone of fairness in federal capital charging. Accuracy in judicial fact-finding surpasses any generalized confidentiality interest, particularly where the defendant faces the death penalty.

### V. A Lesser Standard is Applicable to Discovery Requests of this Nature

By definition, the full facts and circumstances surrounding the government's "deliberative process" may not yet be fully developed to the extent needed to prevail on the merits. **That is precisely why a lesser standard is applied to discovery relevant to such claims**. *See*, *e.g.*, *U.S. v. Alameh*, 341 F.3d 167, 174 (2d Cir. 2003) ("[Defendant] argues that the standard for discovery is a lesser standard than that for the merits, and we agree."); *U.S. v. Gist*, No. 03:CR-07-387, 2008 U.S. Dist. LEXIS 48010, at *10 (M.D. Pa. June 20, 2008) ("The threshold showing to warrant a

18

dismissal of an indictment based on selective prosecution is far greater than that to receive discovery based on such a claim."); *U.S. v. Rashwan*, No. 22-118, 2023 U.S. Dist. LEXIS 118501, at *10 (E.D. Pa. July 11, 2023) ("[a] criminal defendant, however, will not often have access to the information, statistical or otherwise, that might satisfy a 'clear evidence' burden. Accordingly, when merely seeking discovery, defendants face a lower burden…"); *U.S. v. Minerd*, 182 F. Supp. 2d 459, 464 (W.D. Pa. 2002) (noting "the lower burden for a discovery motion"). *See also U.S. v. Burke*, No. 1:16-cr-20625, 2017 U.S. Dist. LEXIS 134496, at *8 (E.D. Mich. Aug. 23, 2017) ("Here, Burke is not yet seeking dismissal of the indictment based on a selective prosecution theory. Rather, Burke is only requesting 'production of materials relevant to his claim that the government selected him for prosecution because of his national origin.' A motion for discovery related to a selective prosecution allegation is necessarily governed by a lesser standard.")

## VI. CONCLUSION

The record in this case demonstrates failures that cannot be evaluated without the underlying materials. The Government evinced that it was seeking an expedited recommendation, an internal process used only when the U.S. Attorney recommends against the death penalty. Under DOJ policy, the moment any component considers the death penalty appropriate, the case must be removed from the expedited track and thereafter, ordinary procedures, including a mitigation submission and meeting with the defense, must be triggered. Because defense counsel was never notified of any such shift, the defense could not submit mitigation materials or arguments. The Government then arbitrarily filed a Death Notice without explaining why the case had departed from expedited review or why mitigation was never sought or considered. The initial no-seek recommendation, concurred with and supported by the Capital Case Review Committee, was arbitrarily and prejudicially overridden by the Attorney General, who acted without knowledge of

the fundamental and essential information required by the Protocol and extended to virtually every federal capital-eligible defendant over the entire history of the FDPA.

In this unprecedented case, the authorization process did not comply with constitutional standards. The DOJ has long represented to the courts and Congress that strict adherence to the Protocol prevents arbitrary, uneven, or discriminatory charging. When the Government departs from the same standards it invokes to defend the constitutionality of federal capital prosecutions, discovery is necessary to determine whether improper or incorrect considerations affected the charging decision here. That is all we ask at this point. We respectfully request that the Court grant this motion and compel the government to disclose the materials requested in Exhibit A.

Dated: December 15, 2025

Respectfully submitted,

MATTHEW CAMPBELL
FEDERAL PUBLIC DEFENDER

*s/ Matthew Campbell*
1336 Beltjen Road, Suite 202
Charlotte Amalie, VI 00802
Tel: (340) 774-4449
E-mail: Matt_Campbell@fd.org


*s/John A Diaz, Esq.*
Law Office of John A. Diaz
225 Broadway, Suite 715
New York, NY 10007
Tel: (212) 227-8208
Email: johnadiazlaw@gmail.com